UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

ANTHONY GIGLIETTI, JR.,

       Plaintiff,

    -v-

ANTHONY BOTTALICO, THE
ASSOCIATION OF COMMUTER RAIL
EMPLOYEES, and MTA METRO-NORTH
RAILROAD COMPANY,

       Defendants.

------------------------------------------------------x

No.  10 Civ. 3652 (LTS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2 6 MAY 2011

### MEMORANDUM OPINION AND ORDER

       Plaintiff Anthony Giglietti, Jr. ("Plaintiff" or "Giglietti") brings this action against

Anthony Bottalico ("Bottalico"), the Association of Commuter Rail Employees ("ACRE" and,

together with Bottalico, the "Union Defendants"), and MTA Metro-North Railroad Company

("Metro-North" and, together with the Union Defendants, "Defendants") asserting a "hybrid"

claim pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., as well as claims of

intentional infliction of emotional distress and interference with contract under New York state

law.  Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

for an order dismissing the amended complaint (the "Amended Complaint") for failure to state a

claim upon which relief can be granted.  The Court has jurisdiction of Plaintiff's federal claim

pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of the state law claims pursuant to 28

U.S.C. § 1367.  For the following reasons, the Court grants the motion to dismiss the Amended

Complaint.

BACKGROUND

The following facts alleged in the Amended Complaint, or set forth in documents

incorporated into or referred to in the Amended Complaint,[1] are taken as true for the purposes of

this motion practice.  Plaintiff was employed as an assistant conductor by Metro-North, an

operating agency of the Metropolitan Transportation Authority ("MTA") which provides

commuter rail service, at the time of the relevant events.  (Am. Compl. ¶¶ 3, 6, 9.)  As a Metro-

North conductor, Plaintiff was represented by ACRE, which was chosen by certain categories of

Metro-North employees to act on their behalf and is a party to a collective bargaining agreement

(the "CBA") with Metro-North.  (Id. ¶¶ 3, 5, 6; Joint Decl. of Vincent F. O'Hara and Frank

Rinaldi ("Joint Decl.") Ex. C ("CBA").)  Bottalico is the chairman of ACRE.  (Am. Compl. ¶ 4.)

In 2008 Metro-North implemented the use of "ticket-issuing machines" ("TIMs"), devices that

permit train conductors to collect fares and document the issuance of tickets on board trains.  (Id.

¶¶ 11, 19, 20.)  Plaintiff alleges that "there were problems with the TIM[s] that interfered with

conductors['] . . . ability to collect fares" (id. ¶ 13), but that Metro-North, ACRE, and Bottalico

ignored those problems and insisted on perpetuating the use of TIMs aboard Metro-North trains

(id. ¶¶ 12, 14, 15, 27).

Plaintiff received a letter from Metro-North dated May 5, 2009, informing him of

an investigation of allegations that, on three occasions in January, February, and April 2009,

---

[1]     The Court may also consider any written instrument attached to the complaint,
statements or documents incorporated into the complaint by reference, and documents
possessed by or known to the plaintiff and upon which it relied in bringing the suit.
See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).  Defendants have submitted
copies of the documents referred to in the Amended Complaint.

Plaintiff collected fares, in the amounts of $14, $15, and $14, respectively, but failed to issue a

"duplex" (a substitute document) or to remit the fares to Metro-North.  (Am. Compl. ¶¶ 36, 37;

Joint Decl. Ex. D (the "May 5, 2009, Letter").)  These fares had been paid by "spotters" hired by

Metro-North to monitor the collection and remittance of fares by conductors.  (Am. Compl. ¶

39.)  The May 5, 2009, Letter advised Plaintiff that the investigatory hearing would be held on

May 12, 2009, that Plaintiff had the right to "have duly accredited representation and/or

witnesses present in accordance with [the CBA]," and that a "Pre-Trial Meeting" between Metro-

North and ACRE was scheduled for May 8, 2009.  (May 5, 2009, Letter.)  While the Amended

Complaint does not deny or otherwise discuss the accuracy of the allegations in the May 5, 2009,

Letter, it does refer to the incidents as "error[s]" involving the use of a TIM.[2]  (See, e.g., Am.

Compl. ¶¶ 61, 67, 68, 97, 100.)

Plaintiff was represented by an ACRE representative at the May 12, 2009, formal

investigation hearing.  (Am. Compl. ¶¶ 40-41.)  On May 18, 2009, Metro-North issued a "Notice

of Discipline" indicating that Plaintiff was "[d]ismissed from Metro-North Railroad in all

capacities."  (Joint Decl. Ex. F; Am. Compl. ¶ 44.)  Unbeknownst to Plaintiff, ACRE appealed,

without success, the dismissal decision pursuant to the appeal process established by the CBA.

(Am. Compl. ¶¶ 46-48; see also CBA § 26(g)-(j).)  ACRE then instituted a proceeding before a

Special Board of Adjustment, as provided for by the CBA and the RLA, seeking to reverse

Metro-North's termination of Plaintiff's employment.  (See Am. Compl. ¶56;  Joint Decl. Ex. G;

---

[2]       The Amended Complaint discusses a "$29.00 dollar error." (Am. Compl. ¶ 61; see
also id. ¶¶ 67, 100.)  That is the sum of the first two alleged thefts.  Plaintiff believes
that he was found guilty "only of poor procedure in using the TIM on two occasions
not three."  (Id. ¶ 59.)

CBA §§ 24, 26(j); 45 U.S.C.A. § 153, Second (West 2007) (providing for the establishment of special boards of adjustment).)  On December 9, 2009, the Special Board of Adjustment denied Plaintiff's claim.  (Am. Compl. ¶ 58; Joint Decl. Ex. H ("December 2009 Award")[3].)  Plaintiff complains that ACRE and Bottalico failed to represent him adequately by failing to obtain a lawyer for him in connection with the May 12, 2009, investigation hearing or subsequent appeals (Am. Compl. ¶¶ 42, 57, 52);[4] failing to inform him of the various appeals of the dismissal decision, of the submissions made in connection therewith, and of his right to participate in those proceedings (id. ¶¶ 47, 48, 52, 53, 55. 63)[5]; and of refusing to "intercede" on Plaintiff's behalf in order to have him reinstated to his position with Metro-North despite Bottalico's having

---

[3]     As noted above, Plaintiff contends that the "award did not find plaintiff guilty of theft, but only of poor procedure in using the TIM on two occasions not three." (Am. Compl. ¶ 59.)  This allegation is clearly contradicted by the text of the award, which denied Plaintiff's application to reverse his termination and specifically rejected Plaintiff's explanation that he was unable to issue tickets to the spotters because of TIM malfunction in light of his failure to issue duplexes, which were intended for use in case of such a malfunction, and his failure to remit the fares to Metro-North at the end of the day of each incident. (See December 2009 Award (denying Plaintiff's claim in its entirety).)

[4]     Plaintiff was in fact represented by a union representative at all stages of the proceedings.  To the extent that Plaintiff asserts that Defendants failed to provide a non-union representative or attorney, the CBA provides no such right.  (See CBA §§ 1(d) (defining "duly accredited representative" as "a member of the Local Committee of Adjustment of [ACRE] having jurisdiction or a member of [ACRE] designated by the general chairman), 26 (permitting employees subject to discipline to be represented by a duly accredited representative).)

[5]     Plaintiff also alleges that ACRE failed to advise him that "he could arbitrate [the dismissal] decision in Chicago as opposed to the Special Board of Adjustment" provided for by the CBA. (Am. Compl. ¶ 53.)  Although no authority is cited for this contention, it appears to be based on the RLA's provision that the headquarters of the National Railroad Adjustment Board is to be maintained in Chicago.  See 45 U.S.C.A. § 153, First (s) (West 2007).  Special boards of adjustment may be established by parties to disputes otherwise referable to the National Railroad Adjustment Board in order to resolve such disputes.  See 45 U.S.C.A. § 153, Second (West 2007).

successfully done so on behalf of other conductors who had been found to have committed thefts in amounts as large as $11,000 (Am. Compl. ¶¶ 64-67). Plaintiff also takes issue with the adequacy of the investigation and the resulting dismissal, asserting that the spotters identified Plaintiff "from pictures under dubious circumstances," that their testimony was not challenged (id. ¶ 42), and that the dismissal "is questionable in as much as [P]laintiff . . . was fired . . . when other conductors, who were guilty of larger errors or theft extending to thousands of dollars[,] received lesser or no punishment" (id. ¶ 62).

Bottalico receives a significant portion of his income from Metro-North. (Am. Compl. ¶¶ 16.) Plaintiff alleges that, in exchange for this compensation, Bottalico "is required to support Metro-North's policies" (id. ¶ 18), and in particular Metro-North's policy favoring the use of TIMs (id. ¶¶ 19-20, 25-28). Metro-North has long had a practice of paying certain union officials who are themselves Metro-North employees (including officials of unions other than ACRE) the full salaries of the rail service jobs for which they are qualified and releasing them from such rail service jobs to instead work on various tasks relevant to union-management relations. (Id. ¶¶ 17, 19, 21-22, 24, 25; see also Joint Decl. Exs. J (the "March 8, 2001, Memorandum"), K (the "February 28, 2002, Memorandum"), L (the "March 7, 2008, Letter").[6])

_____

[6]    The three memoranda are cited in the Amended Complaint and may thus be considered on this motion practice. In the March 8, 2001, Memorandum, which was addressed by a C.J. Wytenus to Peter Cannito, then-president of Metro-North, the author discussed "anonymous complaints made to the Inspector General's office" concerning the assignment of two ACRE union officials to full time "company business" positions. (March 8, 2001, Memorandum at 1.) The Memorandum states that "[t]hese two union representatives handle matters that concern both union and management at meetings on a wide range of activities" (id.) and that these positions were created in order to reduce the number of "train service personnel (engineers and conductors)" who were permitted to be "marked off," and whose shifts had to be "covered off of the extra list or by regular train service personnel (often at premium pay), for various meetings with management" (id. at 2). Wytenus related that Metro-

The arrangements are terminable at any time.  Plaintiff asserts that, because Bottalico receives

compensation from Metro-North that can be terminated at Metro-North's will, Bottalico and

ACRE are subject to influence by Metro-North — including enlistment in support of Metro-

North's mission to require conductors to use TIMs and to suppress any evidence of the TIMs'

---

North had found that having fewer employees engaged full time to attend to labor-
management issues was cost effective (and therefore that these are not "no show"
positions).  (Id. at 2-3.)  The Memorandum notes that a similar complaint had
previously been made about two other ACRE officials, including Bottalico.  (Id. at 1.)
In the February 28, 2002, Memorandum to Cannito, Wytenus discusses a letter sent by
an official of another union, the UTU, to the Connecticut Department of
Transportation, making allegations that "are identical in many respects to a number of
anonymous complaints that have been forwarded to us by MTA's Inspector General
over that past two years."  (February 28, 2002, Memorandum at 1.)  Wytenus explains
that UTU's complaint arises from its loss to ACRE in a February 2000 representation
election, which UTU alleged Metro-North influenced by paying ACRE officials for
time spent campaigning.  (Id. at 1-3.)  Finally, in the March 7, 2008, letter to Karen
Rae, the New York State Department of Transportation Deputy Commissioner of
Policy and Strategy, Cannito expresses his "dismay about devoting the time to
respond to the allegations [in a letter from a UTU official to Rae], since the very same
charges he makes have repeatedly been made over the last eight years in complaints to
the Office of the MTA Inspector General (four complaints), the federal National
Mediation Board, the Office of the New York State Comptroller, officials of the
Connecticut Department of Transportation, the Executive Director and CEO of MTA,
and to several members of the State Legislature."  (March 7, 2008, Letter at 1.)
Cannito notes that "compensation to union officials who are released from their
railroad duties to conduct union business with their employers is by no means unusual
and, indeed, is quite common in the transportation industry," that prior collective
bargaining agreements with ACRE's predecessors provided for such compensation,
and that having specially designated employees to represent union interests before
Metro-North is more effective than "to deal haphazardly with various groups of
employees having different agendas."  (Id. at 2.)  The question of whether the
payment of ACRE union leaders compensation by Metro-North resulted in improper
employer domination of the union came before the National Mediation Board in 2002
in the context of a disputed union election.  There, a rival union alleged that Metro-
North's payment of "release time" to ACRE officials, including Bottalico, constituted
illegal "carrier interference" with employees' choice of representative in that Metro-
North subsidized, and therefore dominated, ACRE.  In re Ass'n of Commuter Rail
Emps. 29 N.M.B. 458, 459-60 (2002).  The Board held that ACRE was not dominated
by Metro-North, reasoning that "[t]he amount of release time [paid to union officials]
is not proof of carrier domination."  Id. at 473.

flaws – so as to effectively deprive Plaintiff of any union representation. (Am. Compl. ¶¶ 28, 30, 32-33, 35, 54, 68-69.) Plaintiff alleges that, as a result of these payments from Metro-North, ACRE "took a dive" in the disciplinary proceedings in order to please Metro-North and thereby safeguard Bottalico's compensation. (Am. Compl. ¶ 75.)

Plaintiff also asserts that Metro-North breached a number of provisions of the CBA in its conduct of the investigation and disciplinary process. In particular, Plaintiff alleges that Metro-North violated the provision of the CBA requiring that the Special Board of Adjustment is to be composed of one Metro-North representative, one ACRE representative, and one jointly selected neutral member, because as a result of Bottalico's compensation by Metro-North, "Metro-North was, in effect, appointing all three [Board members]" (Am. Compl. ¶ 86); that Metro-North "did not conduct a fair and impartial investigation" as required by the CBA, presumably due to its payments to and alleged conspiracy with Bottalico (id. ¶¶ 87-88); that Metro-North was required by the CBA to, but did not, pay Plaintiff when he was taken out of service during the investigation (id. ¶ 89); that Metro-North failed to timely notify Plaintiff of the investigation (id. ¶ 90); and that Metro-North violated the notification requirements with respect to its disciplinary decisions (id. ¶¶ 92-94).

## DISCUSSION

In adjudicating a motion to dismiss a complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. See Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007). Nevertheless, "[t]o survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard applies to all civil actions. Iqbal, 129 S. Ct. at 1953. "[M]ore than a sheer possibility that a defendant has acted unlawfully" is required and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949 (citing Twombly, 550 U.S. at 555 (2007)). In applying these principles, the Court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 129 S. Ct. at 1950. Eliminating the conclusory allegations from consideration, the Court next determines whether the remaining "well-pleaded, nonconclusory factual allegation[s]" regarding Defendants' conduct "g[i]ve rise to a 'plausible suggestion of [illegal activity].'" Id.

Under the RLA, "[a] union 'has a duty to represent fairly all employees subject to the collective bargaining agreement." Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (quoting Spellacy v. Airline Pilots Ass'n, Int'l, 156 F.3d 120, 126 (2d Cir. 1998)). "[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith,'"Airline Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (quoting Vaca v. Sipes, 386 U.S. 171, 190 (1967)), and there is a "'causal connection between the union's wrongful conduct and the [plaintiff's] injuries,'" Vaughn, 604 F.3d at 709 (quoting Spellacy, 156 F.3d at 126). The Court's review of allegations of breach of a union's duty of fair representation (the "DFR claim") is "highly deferential, recognizing the wide latitude that unions need for the effective performance of their bargaining responsibilities." Id. (internal quotation marks, citation, and alteration omitted).

"A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers, 415 F.3d 279, 282-83 (2d Cir. 2005) (internal quotation marks, citation, and alteration omitted). "Tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." Barr v. United Parcel Serv., Inc., 868 F.2d 36, 43 (2d Cir. 1989). "A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" Vaughn, 604 F.3d at 709 (quoting Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge, 403 U.S. 274, 301 (1971)). "Bad faith, which 'encompasses fraud, dishonesty, and other intentionally misleading conduct,' requires proof that the union acted with 'an improper intent, purpose, or motive.'" Id. at 709-10 (quoting Spellacy, 156 F.3d at 126).

Plaintiff specifically alleges, and the documents referred to in the Amended Complaint corroborate, that Bottalico is paid a salary by Metro-North and is not required to perform regular railway duties, and that the arrangement can be terminated at any time. Plaintiff also alleges that he was accused of failing properly to collect and remit $43 in fares in connection with his use of the TIM, was found to have violated procedures and that his employment was terminated as a sanction for the violations. He identifies a number of alleged procedural violations, including noncompliance with notice timing procedures and failure to inform him that certain measures were being pursued. He also asserts that other, unidentified, employees were retained by Metro-North after "intervention" by the union after having been

found to have stolen amounts much greater than $43.

The thrust of Plaintiff's DFR claim is his assertion that the outcome of the disciplinary process was the product of collusion between Botallico and Metro-North, and that Bottallico was motivated to produce a result consistent with Metro-North's goal of requiring TIM use by the conductors by the potential for termination of his compensation arrangement were Metro North to be displeased with the outcome of the proceedings against Plaintiff. This theory of violation is supported only by conclusory allegations of bad faith action, and formulaic recitations of the elements that are required to be proven to succeed on a DFR claim.[7] Stripped of the conclusory allegations of bad faith and collusion, the Amended Complaint's factual allegations are insufficient to push Plaintiff's DFR claim over line from possible to the requisite plausible showing of entitlement to relief. The pleading and the memos relating to payments by Metro-North to union officials make it clear that this compensation structure has been in place for at least ten years at Metro North. In and of itself, the compensation structure is

---

[7]    See, e.g., Am. Compl. ¶¶ 28 ("in performing his duties for Metro-North, Bottalico acted in opposition to the best interest of the union members"), 32 ("Bottalico[,] in receiving money from Metro-North . . . cannot act in an independent and unbiased manner"), 50 ("Plaintiff was never informed by ACRE of the tremendous service that Bottalico provided to Metro-North to justify his Metro-North salary), 69 ("Upon information and belief ACRE was and is supporting Metro-North's use of the TIM in detriment to its members['] interests."), 70 ("Bottalico[,] in collecting most of his salary from Metro-North . . . , cannot act in an independent and unbiased manner), 72 ("the ardor and vigor provided by ACRE and Bottalico in plaintiff's defense of these [disciplinary] charges is questionable because of ACRE, by virtue of its chairman's receiving payment from Metro-North, had questionable loyalty and a conflict of interest"), 74 ("ACRE's support of TIM issues and the arbitrary. capricious and unconscionable punishment that plaintiff received is a result of ACRE's chairman's agreement with Metro-North"), 75 ("because ACRE's chairman is receiving payments directly from Metro-North . . . there is an inference that ACRE in its representation of . . . plaintiff took a dive"). 78 ("in its representation of plaintiff. ACRE's conduct was arbitrary"), 79 ("in its representation of plaintiff. ACRE did not exercise complete good faith and honesty"). 80 ("in its representation of plaintiff. ACRE treated plaintiff with hostility and discrimination").

insufficient to support an inference that the Union does not represent its members in an appropriate fashion, much less that Bottalico or ACRE acted with "an improper intent, purpose or motive" in connection with the charges against Giglietti. At most, the properly pleaded factual allegations might establish that ACRE and Bottalico were negligent.[8]  Similarly, Plaintiff alleges no facts supporting an inference that the alleged failure to intercede in his dismissal for TIM-related violations was so far outside of the range of reasonableness as to be irrational, especially in light of Plaintiff's allegations that full implementation of the TIM was a policy priority for Metro-North.  In short, the Court's "highly deferential" review of Plaintiff's well plead factual allegations reveals those allegations to be insufficient to state a claim of breach of the duty of fair representation by the Union Defendants.

Because Plaintiff has failed to state a claim for breach of duty of fair representation against ACRE, his claim against Metro-North must also fail.  See White v. White Rose Food, 237 F.3d 174, 178-79 (2d Cir. 2001).  Furthermore, the Court declines to exercise supplemental jurisdiction of Plaintiff's state law claims.  See 28 U.S.C. §1367(c)(3).

---

[8]      As is clear from the December 2009 Award, ACRE put forward precisely the same theory of Plaintiff's "errors" as Plaintiff asserts in this action and pressed Plaintiff's case through all available levels of appeals.  Cf. Henry v. United Parcel Serv., Inc., 602 F. Supp. 2d 419, 423-424 (E.D.N.Y. 2009) (dismissing hybrid claim for failure to state a DFR claim where plaintiff alleged that union failed to communicate status of grievance proceedings, union erroneously told plaintiff that he had prevailed, and union discouraged plaintiff from retaining independent counsel).

CONCLUSION

For the forgoing reasons, Defendants' motion to dismiss the Amended Complaint is granted.  This Order terminates docket entry no. 22.  The pre-trial conference scheduled for June 3, 2011, is cancelled.  The Clerk of Court is respectfully requested to enter judgment in favor of Defendants and close this case.

SO ORDERED.

Dated: New York, New York
       May 26, 2011

_____
LAURA TAYLOR SWAIN
United States District Judge